**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STEPHEN AUSTEN, derivatively on behalf of SYMBOTIC INC.,<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD B. COHEN, CAROL J. HIBBARD, ROLLIN FORD, CHARLES KANE, TODD KRASNOW, VIKAS PAREKH, DANIELA RUS, and MERLINE SAINTIL,<br><br>Defendants,<br><br>and<br><br>SYMBOTIC INC.,<br><br>Nominal Defendant. | Case No.: 1:24-cv-12522<br><br>JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Stephen Austen ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Symbotic Inc. ("Symbotic" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Richard B. Cohen ("Cohen"), Carol J. Hibbard ("Hibbard"), Rollin Ford ("Ford"), Charles Kane ("Kane"), Todd Krasnow ("Krasnow"), Vikas Parekh ("Parekh"), Daniela Rus ("Rus"), and Merline Saintil ("Saintil") (collectively, the "Individual Defendants," and together with Symbotic, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Symbotic, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and against

Defendants Cohen and Hibbard for contribution under Sections 10(b) and 21D of Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Symbotic, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Symbotic's current and/or former directors and officers from May 6, 2024 through July 29, 2024, both dates inclusive (the "Relevant Period").

2. Symbotic is an automation technology company purportedly "established to develop technologies to improve operating efficiencies in modern warehouses."[1] The Company represents that its vision is "to make the supply chain for better for everyone" and that it achieves this by "developing innovative, end-to-end technology solutions that dramatically improve supply chain operations."[2]

3. The Relevant Period began on May 6, 2024 when Symbotic issued a press release

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/1837240/000183724023000189/sym-20230930.htm
[2] *Id.*

announcing its financial results for the second quarter of the fiscal year 2024. In relevant part, the press release stated that "Symbotic posted revenue of $424 million, a net loss of $41 million and adjusted EBITDA of $22 million." In addition, Defendants announced Symbotic's guidance for the third quarter, revealing that the Company was expecting "revenue of $450 million to $470 million, and adjusted EBITDA of $27 million to $29 million."

4. Defendants continued to make statements throughout the Relevant Period touting Symbotic's projected earnings outlook. However, these statements concealed the reality, particularly that Symbotic was not equipped to timely deploy their systems or otherwise properly manage expenses through project delays.

5. The truth emerged on July 29, 2024 when the Company published their financial results for the third quarter of fiscal year 2024. Notably, these earnings failed to meet projections, in large part due to below-expectation gross margins; indeed, Symbotic's third quarter adjusted EBITDA of $15 million missed Defendants' prior guide by $13 million at the midpoint, which accounted to a more than 46.4% reduction. Due to the foregoing, Defendants provided guidance for the fourth quarter of fiscal year 2024 that fell far below market expectations.

6. On this news, the price per share of the Company's common stock fell $8.38, or 23.52%, from a closing price of $35.63 per share on July 29, 2024 to close at a price of $27.25 per share on July 30, 2024.

7. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Symbotic, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that Symbotic's potential for margin growth in the third quarter of 2024 was drastically

smaller than Defendants had led investors to believe, largely due to the fact that Symbotic was not truly equipped to timely deploy their systems or manage expenses through project delays. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

9. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls. Moreover, during the Relevant Period, while the Company's stock price was artificially inflated due to the foregoing misrepresentations, two of the Individual Defendants breached their fiduciary duties by selling shares of Company stock on inside information, for which they received combined total proceeds of over $1.9 million.

10. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendant Cohen's and Hibbard's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous

activities that had an effect in this District.

## PARTIES

### Plaintiff

17. Plaintiff is a current shareholder of Symbotic. Plaintiff has continuously held Symbotic common stock at all relevant times.

### Nominal Defendant Symbotic

18. Symbotic is a Delaware corporation with its principal executive offices at 200 Research Drive, Wilmington, MA 01887. Symbotic's common stock trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "SYM."

### Defendant Cohen

19. Defendant Cohen has served as the Company's CEO since November 19, 2022 and as a Company director and as Symbotic's President and Chief Product Officer since July 2022. According to the Schedule 14A the Company filed with the SEC on January 19, 2024 (the "2024 Proxy Statement"), as of January 5, 2024, Defendant Cohen beneficially owned 219,323,968 shares of the Company's common stock, representing 37.5% of the Company's total outstanding stock.[3] Given that the price per share of the Company's common stock at the close of trading on January 5, 2024 was $43.39, Defendant Cohen owned approximately $9.5 billion worth of Symbotic stock as of that date. [4]

---

[3] Footnote 1 on page 40 of the 2024 Proxy Statement states: "Richard Cohen may be deemed to beneficially own Class V-1 and Class V-3 common stock owned of record by (A) the RBC 2021 4 Year GRAT, for which he serves as sole trustee, (B) RJJRP Holdings, Inc., of which he is the President and Chief Executive Officer, and (C) the Richard Cohen Revocable Trust, for which he serves as sole trustee."

[4] Page 40 of the 2024 Proxy Statement states: "The beneficial ownership of shares of [Symbotic's] common stock is based on (i) 85,295,300 shares of Class A common stock issued and outstanding as of January 5, 2024, (ii) 81,487,643 shares of Class V-1 common stock issued and outstanding as of January 5, 2024, and (iii) 406,512,941 shares of Class V-3 common stock issued and outstanding as of January 5, 2024." The stock ownership calculations contained herein for each

20. The 2024 Proxy Statement stated the following about Defendant Cohen:

> Mr. Cohen has served as a member of our board of directors and as our President and Chief Product Officer since the Closing and has served as our Chief Executive Officer since November 19, 2022. Mr. Cohen served as Chair of Warehouse from December 2006 and as President of Symbotic LLC from November 2017 until the Closing. Mr. Cohen previously served as Chief Executive Officer of Symbotic LLC from November 2017 to April 2022. He is also the Executive Chair of C&S Wholesale Grocers, Inc., one of the largest grocery wholesalers in the United States, where he is the third generation of the Cohen family to lead that company. Mr. Cohen grew up in the C&S Wholesale Grocers business, working for his father during summers until his graduation from college in 1974, when he went to work full-time at C&S Wholesale Grocers. Mr. Cohen became Chair, President and Chief Executive Officer of C&S Wholesale Grocers in 1989 and served as President until March 2014 and as Chief Executive Officer until January 2018, during which time he led the growth and expansion of C&S Wholesale Grocers into an industry leader in supply chain solutions and wholesale grocery supply. Mr. Cohen holds a bachelor's degree in accounting from the Wharton School of Business. He has also been awarded honorary doctorate degrees from Assumption College and Keene State College. Mr. Cohen was selected to serve on the board of directors due to his extensive experience in the wholesale distribution business, his vision and experience in automation and his experience and track record in entrepreneurship, investment and business development and deep relationships in various industries.

**<u>Defendant Hibbard</u>**

21. Defendant Hibbard has served as Symbotic's CFO and Treasurer since December 15, 2023. She previously served as Symbotic's CFO designate from October 2023 until December 2023.

22. The 2024 Proxy Statement stated the following about Defendant Hibbard:

> Ms. Hibbard served as our Chief Financial Officer designate from October 2023 until December 2023 and has served as our Chief Financial Officer and Treasurer since December 15, 2023. Ms. Hibbard has more than 25 years of finance and accounting leadership experience. Prior to joining Symbotic, Ms. Hibbard served as Senior Vice President and Controller at The Boeing Company, a major aerospace firm, since April 2021. Before that, Ms. Hibbard held various strategic and financial roles with The Boeing Company, including Vice President and Chief Financial Officer of Boeing Defense, Space & Security ("BDS") from May 2017 through

---

Individual Defendant are based on the sum of that Individual Defendant's shares of Company Class A, Class V-1, and Class V-3 Common Stock, multiplied by $43.39 (*i.e.*, the closing price of the Company's common stock on January 5, 2024).

> April 2021, Controller of BDS from January 2017 until May 2017 and as Vice President and Chief Financial Officer of The Boeing Company's former Engineering, Operations & Technology organization from April 2015 until January 2017. Prior to that, Ms. Hibbard held successive executive positions in financial planning & analysis, estimating, and procurement and supported numerous business unit programs since joining The Boeing Company in 1996. Ms. Hibbard earned a Bachelor of Science degree in statistics and business from the University of Pittsburgh and a Master of Business Administration degree from Virginia Polytechnic University.

**Defendant Ford**

23. Defendant Ford has served as a Company director since July 2022. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of January 5, 2024, Defendant Ford beneficially owned 10,447 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 5, 2024 was $43.39, Defendant Ford owned approximately $453,295 worth of Symbotic stock as of that date.

24. For the fiscal year ended September 30, 2023 (the "2023 Fiscal Year"), Defendant Ford received $232,361 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $167,361 in stock awards.

25. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Ford made the following sales of Company stock:

| DATE | # OF SHARES SOLD | AVG. PRICE PER SHARE ($) | PROCEEDS ($) |
|---|---|---|---|
| **2024-06-07** | 49,998 | $37.29 | $1,864,425 |

Thus, in total, before the fraud was exposed, he sold 49,998 shares of Company stock on inside information, for which he received approximately $1,864,425 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and

omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26. The 2024 Proxy Statement stated the following about Defendant Ford:

> Mr. Ford has served as a member of our board of directors since the Closing. Mr. Ford served as a member of the Warehouse advisory board from August 2016 until the Closing. Mr. Ford retired in 2016 from Walmart Stores, Inc., where he served in a variety of executive leadership roles during his 33-year career with the world's largest retailer. Mr. Ford began his career with Walmart in 1984 in the Logistics division and later became the Chief Logistics Officer where he was responsible for transforming and building the company's global supply chain network. He also served as the Executive Vice President and Chief Information Officer from May 2006 to January 2012, having responsibility for the company's worldwide technology division. Most recently, Mr. Ford served as the Chief Administrative Officer from February 2012 to July 2016 where he focused on leveraging Walmart's scale to increase efficiency and productivity around the world while having responsibility for the domains mentioned above, which also included back office (shared services), global sourcing and data and analytics. Mr. Ford holds a Bachelor of Science degree from Taylor University in Indiana. In retirement, Mr. Ford has joined the boards of Mercy Health System and John Brown University and the board of advisors of AT Kearney. Mr. Ford was selected to serve on the board of directors due to his experience as a senior executive at Walmart and his background and knowledge relating to logistics, the supply chain and technology.

**Defendant Kane**

27. Defendant Kane has served as a Company director since July 2022. He also serves as Chair of the Audit Committee. According to the 2024 Proxy Statement, as of January 5, 2024, Defendant Kane beneficially owned 829,353 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 5, 2024 was $43.39, Defendant Kane owned approximately $36 million worth of Symbotic stock as of that date.

28. For the 2023 Fiscal Year, Defendant Kane received $237,361 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $167,361 in stock awards.

29. The 2024 Proxy Statement stated the following about Defendant Kane:

> Mr. Kane has served as a member of our board of directors since the Closing. Mr. Kane served as a member of the Warehouse advisory board from October 2020 until the Closing. Mr. Kane has been a lecturer at the Massachusetts Institute of Technology since September 2006 and is currently an adjunct professor of International Finance at the Massachusetts Institute of Technology Sloan School of Management. Since November 2006, Mr. Kane has also been a Director and Strategic Advisor of One Laptop Per Child, a nonprofit organization that provides computing and internet access for students in the developing world, for which he served as President and Chief Operating Officer from 2008 until 2009. Mr. Kane served as Executive Vice President and Chief Administrative Officer of Global BPO Services Corp., a special purpose acquisition corporation, from July 2007 until March 2008, and as Chief Financial Officer of Global BPO from August 2007 until March 2008. Prior to joining Global BPO, he served as Chief Financial Officer of RSA Security Inc., a provider of e-security solutions, from May 2006 until RSA was acquired by EMC Corporation in October 2006. From July 2003 until May 2006, he served as Chief Financial Officer of Aspen Technology, Inc., a publicly traded provider of supply chain management software and professional services. Mr. Kane is currently a director of Alkami Technology, Inc. (ALKT), a leading cloud-based digital banking solutions provider for banks and credit unions in the United States, and Progress Software Corp. (PRGS), a software company that specializes in the implementation of business applications. He was previously a director of Applix Inc., Borland Software Corporation, Carbonite, Inc., Demandware Inc., Netezza Corporation and RealPage, Inc. Mr. Kane is a Certified Public Accountant and holds a B.B.A. in accounting from the University of Notre Dame and an M.B.A. in international finance from Babson College. Mr. Kane was selected to serve on the board of directors due to his experience as a senior executive officer at a number of publicly traded companies, including as chief financial officer of several of those companies, and his experience serving on the boards of directors of other public and private companies.

**Defendant Krasnow**

30. Defendant Krasnow has served as a Company director since July 2022. He also serves as Chair of the Compensation Committee. According to the 2024 Proxy Statement, as of January 5, 2024, Defendant Krasnow beneficially owned 1,214,055 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 5, 2024 was $43.39, Defendant Krasnow owned approximately $52.7 million worth of Symbotic stock as of that date.

31. For the 2023 Fiscal Year, Defendant Krasnow received $232,361 in total

compensation from the Company. This included $65,000 in fees earned or paid in cash and $167,361 in stock awards.

32. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Krasnow made the following sales of Company stock:

| DATE | # OF SHARES SOLD | AVG. PRICE PER SHARE ($) | PROCEEDS ($) |
|---|---|---|---|
| **2024-07-02** | 2,000 | $35.49 | $70,972 |

Thus, in total, before the fraud was exposed, he sold 2,000 shares of Company stock on inside information, for which he received approximately $70,972 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

33. The 2024 Proxy Statement stated the following about Defendant Krasnow:

> Mr. Krasnow has served as a member of our board of directors since the Closing. Mr. Krasnow served as a member of the Warehouse advisory board from May 2016 until the Closing. Mr. Krasnow has served as the President of Cobbs Capital, Inc., a private consulting company, since January 2005. Previously, Mr. Krasnow was a marketing domain expert with Highland Consumer Fund, a venture capital firm, from June 2007 until it became Porchlight Equity in February 2017, after which he was an operating partner of Porchlight Equity until November 2019. Mr. Krasnow was the Chair of Zoots, Inc., a dry-cleaning company, from June 2003 to January 2008 and Chief Executive Officer of Zoots, Inc. from February 1998 to June 2003. He served as the Executive Vice President of Sales and Marketing of Staples, Inc. from May 1993 to January 1998 and in other sales and marketing positions for Staples, Inc. from March 1986 to May 1993. Mr. Krasnow has served as a member of the C&S Wholesale Grocers advisory board since 2006. Mr. Krasnow is a director of Ecentria, a privately held online marketer of optical, outdoor and camping gear, and Kids2 Inc., a privately held baby and toddler products company. He was previously a director of Bakkavor, LTD, Carbonite, Inc. and Tile Shop Holdings, Inc. Mr. Krasnow holds a Master of Business Administration degree from the Harvard Business School and a bachelor's degree in chemistry from Cornell University. Mr. Krasnow was selected to serve on the board of directors due to his experience as a senior executive, his experience in investment, marketing and business development, and his experience serving on the boards of directors of

other public and private companies.

**Defendant Parekh**

34. Defendant Parekh has served as a Company director since July 2022. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

35. The 2024 Proxy Statement stated the following about Defendant Parekh:

> Mr. Parekh has served as a member of our board of directors since the Closing. Mr. Parekh is a Managing Partner at SoftBank Investment Advisers where he focuses on investing in enterprise software and emerging technologies. Mr. Parekh has made investments and holds director seats across public and private markets. Prior to joining SoftBank Investment Advisers in March 2016, Mr. Parekh worked in private equity at Kohlberg Kravis Roberts & Co. L.P., a global investment firm, and in consulting at Boston Consulting Group, a global consulting firm. Mr. Parekh holds an MBA from Harvard Business School and a Bachelor of Science degree in Electrical Engineering and a Master of Science degree in Electrical and Computer Engineering from Georgia Institute of Technology. Mr. Parekh was selected to serve on the board of directors due to his extensive experience in the emerging technologies space.

**Defendant Rus**

36. Defendant Rus has served as a Company director since March 1, 2023. According to the 2024 Proxy Statement, as of January 5, 2024, Defendant Rus beneficially owned 10,447 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 5, 2024 was $43.39, Defendant Rus owned approximately $453,295 worth of Symbotic stock as of that date.

37. For the 2023 Fiscal Year, Defendant Rus received $196,527 in total compensation from the Company. This included $29,166 in fees earned or paid in cash and $167,361 in stock awards.

38. The 2024 Proxy Statement stated the following about Defendant Rus:

> Prof. Rus has served as a member of our board of directors since March 1, 2023. Prof. Rus has been a professor at the Massachusetts Institute of Technology (MIT) since 2004 and currently serves in a number of positions, including the Andrew

> (1956) and Erna Viterbi Professor of Electrical Engineering and Computer Science since 2004, the Director of the Computer Science and Artificial Intelligence Laboratory (CSAIL) since 2012 and the MIT Director of the DAF-MIT Artificial Intelligence Accelerator since 2019. Prof. Rus also served as the Deputy Dean of Research for Schwarzman College of Computing at MIT from 2019 to 2022. Prior to joining MIT, Prof. Rus was a professor in the Computer Science Department at Dartmouth College from 1994 to 2003. Prof. Rus' research interests are in robotics and artificial intelligence, and the key focus of her research is to develop the science and engineering of autonomy. Prof. Rus is a senior visiting fellow at MITRE Corporation, serves as a USA expert for Global Partnerships in AI, serves on the board of trustees for Mohamed bin Zayed University of Artificial Intelligence (MBZUAI) and on the board of directors of Mass Robotics and serves as a member of several other advisory boards of technical companies. Prof. Rus served as a member of the President's Counsel of Advisors on Science and Technology (PCAST) and on the Defense Innovation Board. Prof. Rus is a MacArthur Fellow, a fellow of the Association for Computing Machinery (ACM), the Association for the Advancement of Artificial Intelligence (AAAI), the Institute of Electrical and Electronics Engineers (IEEE) and the American Academy of Arts and Sciences (AAAS), and a member of the National Academy of Engineering. She is the recipient of the Engelberger Award for robotics, the IEEE RAS Pioneer award, IEEE RAS Technical award, Mass TLC Innovation Catalyst Award, and the IJCAI John McCarthy Award. Prof. Rus holds a bachelor's degree in computer science from the University of Iowa and earned her Ph.D in Computer Science from Cornell University. Prof. Rus was selected to serve on the board of directors due to her research and leadership experience and her field-leading expertise in robotics, artificial intelligence and data science.

**Defendant Saintil**

39. Defendant Saintil has served as a Company director since July 2022. She also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of January 5, 2024, Defendant Saintil beneficially owned 65,447 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 5, 2024 was $43.39, Defendant Saintil owned approximately $2.8 million worth of Symbotic stock as of that date.

40. For the 2023 Fiscal Year, Defendant Saintil received $234,861 in total compensation from the Company. This included $67,500 in fees earned or paid in cash and

$167,361 in stock awards.

41. The 2024 Proxy Statement stated the following about Defendant Saintil:

> Ms. Saintil has served as a member of our board of directors since the Closing. Ms. Saintil served as a member of the Warehouse advisory board from October 2021 until the Closing. Ms. Saintil has served as a technology and business executive at Fortune 500 and privately held companies, including Intuit Inc., a financial software company, Yahoo! Inc., a web services provider, PayPal holdings Inc., a financial technology company, Adobe Inc., a computer software company, Joyent Inc., a cloud computing software company, and Sun Mircrosystems, Inc., a technology company. From April 2019 to February 2020, Ms. Saintil was the Chief Operating Officer, R&D-IT of Change Healthcare Inc., a healthcare technology company. Prior to that, she served as Head of Operations, Product and Technology at Intuit from November 2014 to August 2018, and as Head of Operations of Mobile and Emerging Products at Yahoo from January to November 2014. Ms. Saintil has served as a board member of Banner Corporation (BANR), a bank holding company, since March 2017 and Alkami Technology (ALKT), a leading cloud-based digital banking solutions company, from October 2020 to December 2022. She has also served as a board member of Gitlab Inc. (GTLB), a provider of a DevOps platform to develop, secure and operate software, since November 2020; Evolv Technologies Holdings, Inc. (EVLV), a touchless human security platform company, since January 2021; Rocket Lab USA, Inc. (RKLB), a space exploration company, since June 2021; and TD SYNNEX Corporation (SNX), a global distributor and solutions aggregator for the IT ecosystem, since September 2021. Ms. Saintil earned her Bachelor of Science degree from Florida Agricultural and Mechanical University and her Master of Science degree from Carnegie Mellon. Ms. Saintil was selected to serve on the board of directors due to her executive leadership experience, her extensive experience in technology, enterprise risks, cybersecurity, talent management and digital transformation, and her experience serving on the boards of directors of other public companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42. By reason of their positions as officers and/or directors of Symbotic and because of their ability to control the business and corporate affairs of Symbotic, the Individual Defendants owed Symbotic and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Symbotic in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Symbotic and its shareholders so as to benefit all shareholders equally.

43. Each director and officer of the Company owes to Symbotic and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Symbotic, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

45. To discharge their duties, the officers and directors of Symbotic were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Symbotic, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Symbotic's Board at all relevant times.

47. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

48. To discharge their duties, the officers and directors of Symbotic were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Symbotic were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Symbotic's own Code of Business Conduct and Ethics ("Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Symbotic conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the

business and internal affairs of Symbotic and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Symbotic's operations would comply with all applicable laws and Symbotic's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49. Each of the Individual Defendants further owed to Symbotic and the shareholders the duty of loyalty requiring that each favor Symbotic's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

50. At all times relevant hereto, the Individual Defendants were the agents of each other and of Symbotic and were at all times acting within the course and scope of such agency.

51. Because of their advisory, executive, managerial, and directorial positions with

Symbotic, each of the Individual Defendants had access to adverse, non-public information about the Company.

52. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Symbotic.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

53. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

54. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

55. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Symbotic was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

56. Each of the Individual Defendants aided, abetted, and rendered substantial

assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

57. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Symbotic and was at all times acting within the course and scope of such agency.

**SYMBOTIC'S CODE OF COUNDUCT**

58. Symbotic's Code of Conduct states that "[a]ll directors, officers and employees of the Company are expected to be familiar with this Code and to adhere to those principles and procedures set forth in this Code that apply to them."

59. The Code of Conduct states that the Board adopted the Code of Conduct to:

> • promote honest and ethical conduct, including fair dealing and the ethical handling of conflicts of interest;
> • promote full, fair, accurate, timely and understandable disclosure;
> • promote compliance with applicable laws, rules and regulations;
> • ensure the protection of the Company's legitimate business interests, including corporate opportunities, assets and confidential information; and
> • deter wrongdoing.

60. With respect to waivers, the Code of Conduct states the following:

> From time to time, the Company may waive some provisions of this Code. Any waiver of this Code for executive officers or directors of the Company may be made only by the Board of Directors (and, for the avoidance of doubt, not a committee thereof) and must be promptly disclosed as required by the U.S. Securities and Exchange Commission (the "SEC") or Nasdaq rules. Any waiver for other employees may be made only by the Company's President, Chief Executive Officer or General Counsel and will be reported to the Board of Directors.

61. In a section titled "Honest and Candid Conduct," the Code of Conduct states the

following, in relevant part:

> Each director, officer and employee owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest and candid. Deceit and subordination of principles are inconsistent with integrity. Each director, officer and employee must:
> • act with integrity, including being honest and candid while still maintaining the confidentiality of information where required or consistent with the Company's policies;
> • observe both the form and spirit of laws, rules and regulations, accounting standards and Company policies; and
> • adhere to a high standard of business ethics.

62. In a section titled "Conflicts of Interest," the Code of Conduct states the following:

> A "conflict of interest" occurs when an individual's private interest interferes or appears to interfere with the interests of the Company. A conflict of interest can arise when a director, officer or employee takes actions or has interests that may make it difficult to perform his, her or their Company work objectively and effectively. For example, a conflict of interest would arise if a director, officer or employee, or his, her or their family member or close personal connection, receives improper personal benefits as a result of his, her or their position at the Company. If a director, officer or employee is unsure whether a situation creates a conflict of interest, he, she or they should discuss such situation with the Code of Ethics Contact Person.
>
> Service to the Company should never be subordinated to personal gain and advantage. Conflicts of interest are prohibited as a matter of Company policy, unless they have been properly approved by the Company. In particular, an employee, officer or director must never use or attempt to use his, her or their position at the Company to obtain any improper personal benefit for himself, herself or themselves or for his, her or their family member or close personal connection.
>
> Any employee, officer or director who is aware of a situation that could reasonably be expected to give rise to a conflict of interest or perceived conflict of interest should discuss that matter with the Code of Ethics Contact Person.

63. In a section titled "Disclosure," the Code of Conduct states the following, in relevant part:

> Each director, officer or employee involved in the Company's disclosure process, including the President, the Chief Executive Officer, the Chief Financial Officer and the Corporate Controller (the "Senior Financial Officers"), is required to be familiar with and comply with the Company's disclosure controls and procedures and internal control over financial reporting, to the extent relevant to his, her or

> their area of responsibility, so that the Company's public reports and documents filed or furnished with the SEC comply in all material respects with the applicable federal securities laws and SEC rules and regulations. In addition, each such person having direct or supervisory authority regarding such public reports and documents or the Company's other public communications concerning its general business, results, financial condition and prospects should, to the extent appropriate within his, her or their area of responsibility, consult with other Company officers and employees and take other appropriate steps regarding these disclosures with the goal of making full, fair, accurate, timely and understandable disclosure.

64. In a section titled "Compliance," the Code of Conduct states the following, in relevant part:

> It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each director, officer and employee to adhere to the standards and restrictions imposed by those laws, rules and regulations.
>
> As further described in the Company's Insider Trading Policy, the Company's policy prohibits, and the laws, rules and regulations of the United States and many other countries may prohibit, among others, any director, officer or employee from purchasing, selling or otherwise trading any securities of the Company, including common stock, any other common equity securities or any preferred equity, convertible or debt securities ("Company Securities"), while in possession of "material, non-public information" about the Company. This prohibition also applies to trading in the securities of an entity other than the Company with which the Company has a contractual relationship or may be negotiating a transaction or of a competitor of the Company, in each case, about which you acquire material, non-public information in the course of your duties for the Company.

65. With respect to Corporate Opportunities, Confidentiality, and Fair Dealing, the Code of Conduct also states the following:

> **VI. Corporate Opportunities**
>
> Directors, officers and employees generally owe a duty to the Company to advance the Company's business interests when the opportunity to do so arises. Subject to certain exceptions contained in the Company' certificate of incorporation, directors, officers and employees are prohibited from taking (or directing to a third party) a business opportunity discovered through the use of corporate property, information or position, unless the Company has already been offered the opportunity and turned it down. More generally, directors, officers and employees are prohibited from using corporate property, information or position for personal gain and from competing with the Company.

> Sometimes the line between personal and Company benefits is difficult to draw, and sometimes there are both personal and Company benefits in certain activities. Directors, officers and employees who intend to make use of Company property or services in a manner not solely for the benefit of the Company should consult beforehand with the Code of Ethics Contact Person.
>
> **VII. Confidentiality**
>
> In carrying out the Company's business, directors, officers and employees often learn confidential or proprietary information about the Company, its customers, suppliers, joint venture parties or other persons. Directors, officers and employees must maintain the confidentiality of all information so entrusted to them, except when disclosure is authorized, legally mandated or made in cooperation with a government investigation. Confidential or proprietary information of the Company, and of other persons, includes any non-public information that would be harmful to the relevant person or useful or helpful to competitors if disclosed.
>
> **VIII. Fair Dealing**
>
> We have a history of succeeding through honest business competition. We do not seek competitive advantages through illegal or unethical business practices. Each director, officer and employee should endeavor to deal fairly with the Company's customers, suppliers, joint venture parties and other persons. No director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any unfair dealing practice.

66. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## <u>SYMBOTIC'S AUDIT COMMITTEE CHARTER</u>

67. The Company also maintains an Audit Committee Charter (the "Charter"). According to the Charter, the purpose of the Audit Committee is "to assist the Board's oversight of the Company's accounting and financial reporting processes and the audits of the Company's financial statements."

68. Under a section titled Authority and Responsibilities," the Charter states the following, in relevant part, about the responsibilities of the Audit Committee:

> The Audit Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management, the internal auditors and the Company's registered public accounting firm (the "independent auditor"), in accordance with its business judgment. Management is responsible for the preparation, presentation and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for establishing and maintaining adequate internal control over financial reporting. The internal auditors are responsible for providing the management and the Audit Committee with ongoing assessments of the Company's risk management processes and system of internal control. The independent auditor is responsible for auditing the Company's financial statements and, when required, the Company's internal control over financial reporting and for reviewing the Company's unaudited interim financial statements. The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Audit Committee to plan or conduct any audit, to determine or certify that the Company's financial statements are complete, accurate, fairly presented, or in accordance with generally accepted accounting principles or applicable law, or to guarantee the independent auditor's reports.

69. In a section titled "Review of Other Financial Disclosures," the Charter states that the Audit Committee shall be tasked with, among other things:

> 16. Independent Auditor Review of Interim Financial Statements. The Audit Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and the Chief Financial Officer any matters identified in connection with the independent auditor's review of interim financial information which are required to be discussed by applicable auditing standards. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor's review of interim financial information.

> 17. Earnings Release and Other Financial Information. The Audit Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as other financial information and earnings guidance provided to analysts, rating agencies and/or otherwise publicly disclosed.
>
> 18. Quarterly Financial Statements. The Audit Committee shall discuss with the Company's management and independent auditor the Company's quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

70. In a section titled "Audited Financial Statements," the Charter states that the Audit Committee is tasked with the following:

> 13. Review and Discussion. The Audit Committee shall review and discuss with the Company's management, internal auditors and independent auditor the Company's audited financial statements, including the matters required to be discussed by the requirements of the PCAOB and the SEC.
>
> 14. Recommendation to Board Regarding Financial Statements. The Audit Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.
>
> 15. Audit Committee Report. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

71. In a subsection titled "Risk Management," the Charter states:

> The Audit Committee shall discuss the Company's policies with respect to risk assessment and risk management, including with respect to financial, operational, privacy, security, cybersecurity, business continuity and legal and regulatory risks, as well as guidelines and policies to govern the process by which the Company's exposure to risk is handled.

72. In violation of the Charter, Defendants Kane (as current Chair), Ford, and Parekh failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal controls over financial reporting, disclosure controls and procedures, and Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

73. Symbotic is an automation technology company purportedly "established to develop technologies to improve operating efficiencies in modern warehouses."[5] The Company represents that its vision is "to make the supply chain for better for everyone" and that it achieves this by "developing innovative, end-to-end technology solutions that dramatically improve supply chain operations."[6]

### False and Misleading Statements

***May 6, 2024 Press Release and Earnings Call***

74. On May 6, 2024, Symbotic issued a press release announcing its financial results for the second quarter of the fiscal year 2024 ("2Q24"). In relevant part, the press release stated that "Symbotic posted revenue of $424 million, a net loss of $41 million and adjusted EBITDA of $22 million." In addition, Defendants announced Symbotic's guidance for the third quarter, revealing that the Company was expecting "revenue of $450 million to $470 million, and adjusted EBITDA of $27 million to $29 million."

75. The same day, the Company hosted an earnings call with analysts and investors to discuss its 2Q24 financial results. During the call, Defendant Cohen touted Symbotic's projected growth and emphasized "[k]ey innovations this quarter, includ[ing] advancing [Symbotic's] core technologies and artificial intelligence and automation, improving system performance and the customer experience, enhancing safety, ***and accelerating deployment***."[7]

---

[5] https://www.sec.gov/ix?doc=/Archives/edgar/data/1837240/000183724023000189/sym-20230930.htm
[6] *Id.*
[7] All emphasis has been added unless otherwise noted herein.

76. Later on the call, Defendant Hibbard, Symbotic's CFO and Treasurer, further discussed Symbotic's market trends for 2Q24 and outlined the Company's expectations for the third quarter, stating the following, in relevant part:

> Overall, non-GAAP gross margin was down slightly from last quarter, but still better than expected. The innovations we deployed during the second quarter weighed upon system gross margin, but were largely offset by effective cost management and solid project execution.
>
> System adjusted gross margin remained stable at 20% and generally in line with last quarter. ***As usual, our system gross margin also reflects burden of passthrough costs and lower-margin innovation projects that weigh on a reported gross margin. Our combined recurring revenue streams contributed to positive adjusted gross profit. This demonstrates the high leverage in our business model, showing that we can be profitable with a small number of active sites generating recurring revenue, while also being invested for the much larger number of systems still in deployment.***
>
> . . .
>
> Operating leverage improved again sequentially as we achieved a 5.3% adjusted EBITDA rate, compared to a 3.8% rate last quarter. This was driven by rapid revenue growth and gross margin expansion, along with stable operating expense.
>
> . . .
>
> For the third quarter of fiscal 2024, we expect revenue of $450 million to $470 million and adjusted EBITDA between $27 million and $29 million. This represents revenue growth of over 47% and an adjusted EBITDA margin increase.

77. In addition, Defendant Hibbard elaborated on Symbotic's margins during the question-and-answer portion of the call, stating the following, in relevant part:

> <Q: Nicole Sheree DeBlase – Dutsche Bank AG – Director and Lead Analyst> I wanted to ask a couple on the financials. So the first is the system's gross margin fell to low double digits. I think you guys talked about in the opening remarks how that was driven by all of this innovation that you're working on. I guess, how quickly can that gross margin step up to a high teens or better level? Is that something you expect in the second half? Or will these innovation headwinds continue?
>
> <A: Carol J. Hibbard> We did better than expected on gross margin. But as you indicated, we were stable quarter-over-quarter. And so a couple of items that weigh on our gross margin. So I'll talk about the things that are weighing on those gross margins now and then what we see for the future. So a couple of the things are the innovations that we have in work. ***We talked last quarter about focusing on additional resources to ensure quality deployments for some of those sizable***

> ***projects we have in flow.***
>
> We have the benefit on many of our contracts that we have pass-through costs, so why we're able to pass that through with a profit that remains stable that it weighs on our gross margin.
>
> And then lastly, ***what's weighing on our gross margin is we have several lower margin projects in flow. And I would expect to see those start completing in the second half of this year. And so our 3Q guide reflects stable gross margins***. So as I said, we've got several significant milestones coming up in the second half of the year on some of these big projects. And gross margin won't improve every quarter, but we expect improvement in the coming years and that that will step up year-over- year.
>
> And as I mentioned earlier, just in terms of the unlock for gross margin, ***the single biggest one being the time it takes to deploy our system. And we continue to see steps in the right direction with each one that we're rolling out.***
>
> . . .
>
> <Q: Derek John Soderberg – Cantor Fitzgerald & Co. – Research Analyst> Got it. And then as my follow-up, just to clarify some of your commentary, Carol, I think you said there are some lower-margin projects out there. Can you talk a bit about what's changing on the project front that would characterize a project as low margin at this point? And what kind of step-up in gross margins might we see after, I guess, some of these low-margin projects or work through this year? I'm just looking for you to kind of clarify some of that.
>
> <A: Carol J. Hibbard> Yes. ***So we've got projects in flow that were our earlier innovation projects, some of them fairly early systems, proof of concepts are included in there. And so as they burn off, you'll start to see our gross margin step up***. I'm not going to tie a specific time line to those because the schedules vary. But you should expect into next year gross margin to start stepping up.

***May 9, 2024 Analyst/Investor Day Presentation***

78. On May 9, 2024, the Company hosted its annual Analyst/Investor Day presentation. Defendant Hibbard spoke during the presentation, again highlighting Symbotic's projected margins going forward as follows:

> <Q: Andrew Alec Kaplowitz – Citigroup Inc. – MD & U.S. Industrial Sector Head> Andy Kaplowitz from Citigroup. I mean, clearly, you've always been focused on quality and safety and what have you. But it does seem like today, you're talking about sort of a real focus on Six Sigma and really improving the system. And I think, Carol, you talked about you're going to do some low-margin projects on the earnings call, and you did that big restructuring, Rick.

> So does that mean a pretty big jump in gross margins as you look forward? I know you're not going to give guidance, all that kind of stuff. But like at the same time, I do sense like an increased focus and maybe you clear out stuff with that restructuring and sort of you move forward into next year on a higher playing field. Is that the right perception of what's going on here?
>
> <A: Carol J. Hibbard> I'd say, yes, I'll start, and then I know you talked quite a bit about quality as did Aftab. And it's a huge focus, not just for cost though. It's a focus for scale. So you can't possibly scale if you have poor quality coming from your supply chain or we, in fact, aren't coming down the learning curve in terms of how we're commissioning. So it's both. There is a big focus on doing that, but I think the start of that focus was on how do you continue to scale and grow because with the backlog that we have, we have to deliver that backlog flawlessly so that we can continue to make room to improve and grow the rest of it.

79. The statements referenced in ¶¶74-78 above were materially false and misleading and/or failed to disclose, *inter alia*, that Symbotic's potential for margin growth in the third quarter of 2024 was drastically smaller than Defendants had led investors to believe, largely due to the fact that Symbotic was not truly equipped to timely deploy their systems or manage expenses through project delays. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

80. The truth emerged on July 29, 2024 when the Company published their financial results for the third quarter of fiscal year 2024. Notably, these earnings failed to meet projections, in large part due to below-expectation gross margins. The press release also provided lower-than-expected guidance for Symbotic's fourth quarter of 2024, stating:

> Symbotic posted revenue of $492 million, a net loss of $14 million and adjusted EBITDA of $15 million for the third quarter of fiscal 2024.
>
> . . .
>
> For the fourth quarter of fiscal 2024, Symbotic expects revenue of $455 million to $475 million, and adjusted EBITDA of $28 million to $32 million

81. The same day, the Company hosted an earnings call with analysts and investors to

discuss the results. During the call, Defendant Cohen noted the missed gross margin expectations, stating: "Our third quarter reflects record revenue growth, strong recurring revenue margin, and careful management of operating expenses. ***However, our system gross margin reflects elongated construction schedules and implementation costs associated with last quarter's rapid pace of innovation***." Similarly, Defendant Hibbard admitted that "system gross margin fell below expectations due to schedule growth and higher labor costs during the quarter." She continued, stating: "We are focused on improving our planning, speed of implementation, and project management to enhance performance of the business."

82. Later, during the question-and-answer part of the call, Defendants Cohen and Hibbard further discussed the issues that impacted Symbotic's third quarter gross margins and fourth quarter projections:

> <Q: Andrew Alec Kaplowitz – Citigroup Inc. – MD & U.S. Industrial Sector Head> Rick or carol, can you give a little more color into what happened with system gross margin and why it will rebound in Q4? Are you basically saying that in some cases, outsourcing is not working for your deployments? And maybe what's happened to convince you to take construction management again in-house, and what is the visibility into your Q4 expected margin improvement?
>
> <A: Carol J. Hibbard> . . . So, on the outsourcing, as we talked about outsourcing, our primary reason why we chose outsourcing over a year ago was to go ahead and scale. And so, we did that across multiple areas of our supply chain so that we could also have redundancy.
>
> We're looking at bringing back in-house just 1 element, which is the EPC, so the Engineering Procurement Construction piece of that. And we continue to own a piece of that. So, actually, Symbotic continued to deploy at some of our sites and then we had multiple supply chain partners off doing that.
>
> What we're finding is why that's not a significant item in terms of the overall cost of the system, it's a significant item in terms of that final mile of installation when you're extremely focused on making sure that everything comes together. ***We're finding that focus on schedule and focus on cost, that's a critical point for us***. So, that's one of the elements that we're going to bring back in-house so that we have more control over that overall integration.

> In terms of the other things that really drove our gross margin performance in this quarter, Rick mentioned we've had delays in construction creating inefficiencies. And so, some of our more complex projects, ***we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient.***
>
> And our projects are taking longer. I think last quarter I referred to some of the projects that we had in flow where we're not always going to see that 20-month deployment because I think I called them stragglers. ***And what we're seeing now is some of those complex systems where they're just taking longer. Longer system deployment creates higher costs.***
>
> . . .
>
> <A: Richard B. Cohen> Yes. I think the most important thing is our margin is down, but we're not a retail company, so we're not discounting. We're getting the gross profits that we want, but the projects have been costing more than we anticipated. Keep in mind, we've done about 40 projects so far. We have hundreds ahead of us.
>
> . . .
>
> ***So, I think we made some choices. We could have fought with the customers over who pay some of these things***, but we said, let's just keep the customer happy. Let's keep the sales rolling. Some of these things we'll absorb now. And some of these things will not be expenses in the future, and I fully well expect our margin to come back. And our goal is to enhance the margin further. But just getting back to where everybody expected us to be would be a good place in the near term.
>
> <Q: Andrew Alec Kaplowitz – Citigroup Inc. – MD & U.S. Industrial Sector Head> No, that's fair, Rick. And should we think about it though, as like in "onetime in Q3" and that's why it comes back in Q4? Because you're talking about normalized margins just in this current quarter, basically.
>
> <A: Richard B. Cohen> Yes. I think I'll let Carol speak, but ***things like delays, because things weren't placed orders on time, and you have 200 people standing around the site, that's just not acceptable***. And we don't expect that to happen in the future. So, it's not like we'll go to 0 immediately, but most of this stuff should go away from what we're seeing and the people that we've hired in the fourth quarter.

83. On this news, the price per share of the Company's common stock fell $8.38, or 23.52%, from a closing price of $35.63 per share on July 29, 2024 to close at a price of $27.25 per share on July 30, 2024.

84. Analysts responded negatively to these disclosures, with a number of analysts lowering their price targets for Symbotic. Indeed, William Blair noted that Symbotic's third quarter

adjusted EBITDA was "well below … consensus of $29.1 million" and the projected fourth quarter guidance "came in below … consensus" on both revenue, of $516.9 million, and EBITDA, of $38.9 million." Similarly, BWS Financial Inc. reported that "Sym's management referred to delays in permits and product delivery resulting in people not having anything to do. This is a characterization of a construction/contracting company and not one developing automated technology."

## DAMAGES TO SYMBOTIC

85. As a direct and proximate result of the Individual Defendants' conduct, Symbotic has lost and expended, and will continue to lose and expend, many millions of dollars.

86. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

87. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

88. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

89. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

90. As a direct and proximate result of the Individual Defendants' conduct, Symbotic has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## **DERIVATIVE ALLEGATIONS**

91. Plaintiff brings this action derivatively and for the benefit of Symbotic to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Symbotic, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

92. Symbotic is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93. Plaintiff is, and has been at all relevant times, a shareholder of Symbotic. Plaintiff will adequately and fairly represent the interests of Symbotic in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## **DEMAND FUTILITY ALLEGATIONS**

94. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

95. A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Cohen, Ford, Kane, Krasnow, Parekh, Rus, and Saintil (the "Director-Defendants"). Plaintiff needs only

to allege demand futility as to four of the seven Director-Defendants who are on the Board at the time this action is commenced.

96. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

97. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Symbotic to issue materially false and misleading statements. Specifically, the Director-Defendants caused Symbotic to issue false and misleading statements which were intended to make Symbotic appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

98. Additional reasons that demand on Defendant Cohen is futile follow. Defendant Cohen has served as the Company's CEO since November 19, 2022 and as a Company director and as Symbotic's President and Chief Product Officer since July 2022. Thus, as the Company admits, Defendant Cohen is a non-independent director. As Symbotic's CEO and as one of its trusted directors, Defendant Cohen was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period. As a trusted Company director, Defendant Cohen also conducted little, if any, oversight of

the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Cohen is named as a defendant in the Securities Class Action. For these reasons, Defendant Cohen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

99. Additional reasons that demand on Defendant Ford is futile follow. Defendant Ford has served as a Company director since July 2022. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Ford has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales made during the Relevant Period while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud. For these reasons, Defendant Ford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

100. Additional reasons that demand on Defendant Kane is futile follow. Defendant Kane has served as a Company director since July 2022. He also serves as Chair of the Audit Committee. Defendant Kane has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously

disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kane breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

101. Additional reasons that demand on Defendant Krasnow is futile follow. Defendant Krasnow has served as a Company director since July 2022. He also serves as Chair of the Compensation Committee. Defendant Krasnow has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales made during the Relevant Period while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud. For these reasons, Defendant Krasnow breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

102. Additional reasons that demand on Defendant Parekh is futile follow. Defendant Parekh has served as a Company director since July 2022. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Parekh breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103. Additional reasons that demand on Defendant Rus is futile follow. Defendant Rus has served as a Company director since March 1, 2023. Defendant Rus has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Rus breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

104. Additional reasons that demand on Defendant Saintil is futile follow. Defendant Saintil has served as a Company director since July 2022. She also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Saintil has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Saintil breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

105. Additional reasons that demand on the Board is futile follow.

106. Defendants Kane (as current Chair), Ford, and Parekh (the "Audit Committee

Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

107. All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

108. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and

regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

109. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

110. The acts complained of herein constitute violations of fiduciary duties owed by Symbotic's officers and directors, and these acts are incapable of ratification.

111. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Symbotic. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Symbotic, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action

is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

112. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Symbotic to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

113. Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

114. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

115. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Symbotic's business and affairs.

116. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

117. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Symbotic.

118. In breach of their fiduciary duties owed to Symbotic, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading

statements and/or omissions of material fact that failed to disclose, *inter alia*, that Symbotic's potential for margin growth in the third quarter of 2024 was drastically smaller than Defendants had led investors to believe, largely due to the fact that Symbotic was not truly equipped to timely deploy their systems or manage expenses through project delays. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

119. Moreover, during the Relevant Period, while the Company's stock price was artificially inflated due to the foregoing misrepresentations, two of the Individual Defendants breached their fiduciary duties by selling shares of Company stock on inside information, for which they received combined total proceeds of over $1.9 million.

120. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

121. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

122. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or

recklessly and for the purpose and effect of artificially inflating the price of Symbotic's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

123. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

124. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Symbotic has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

125. Plaintiff, on behalf of Symbotic, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

126. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

127. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Symbotic.

128. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Symbotic that was tied to the performance or artificially inflated valuation of Symbotic or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

129. Plaintiff, as a shareholder and a representative of Symbotic, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of

their fiduciary and contractual duties.

130. Plaintiff, on behalf of Symbotic, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

131. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Symbotic to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

133. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

134. Plaintiff, on behalf of Symbotic, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

135. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

136. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Symbotic in a manner consistent with the operations of a publicly held corporation.

137. As a direct and proximate result of the Individual Defendants' gross

mismanagement and breaches of duty alleged herein, Symbotic has sustained and will continue to sustain significant damages.

138. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

139. Plaintiff, on behalf of Symbotic, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

140. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

141. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Symbotic, for which they are legally responsible.

142. As a direct and proximate result of the Individual Defendants' abuse of control, Symbotic has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

143. Plaintiff, on behalf of Symbotic, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Defendants Cohen and Hibbard for Contribution Under Sections 10(b) and 21D of the Exchange Act**

144. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145. Symbotic and Defendants Cohen and Hibbard are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants

Cohen's and Hibbard's willful and/or reckless violations of their obligations as officers and/or directors of Symbotic.

146. Defendants Cohen and Hibbard, because of their positions of control and authority as officers and/or directors of Symbotic, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Symbotic, including the wrongful acts complained of herein and in the Securities Class Action.

147. Accordingly, Defendants Cohen and Hibbard are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

148. As such, Symbotic is entitled to receive all appropriate contribution or indemnification from Defendants Cohen and Hibbard.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Symbotic, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Symbotic;

(c) Determining and awarding to Symbotic the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Symbotic and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with

applicable laws and to protect Symbotic and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Symbotic to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Symbotic restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury.

Dated: October 2, 2024

**THE BROWN LAW FIRM, P.C.**

*<u>/s/ John Coyle IV</u>*
John Coyle IV
Timothy Brown
767 Third Avenue, Suite 2501

New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: jcoyle@thebrownlawfirm.net
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

# VERIFICATION

I, Stephen Austen, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of October, 2024.

Signed by:

70713544951A4BF...

Stephen Austen